IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DAVID A. BARDES, individually, as )
a taxpayer, )
 )
        Plaintiff, )
 )
        v. )      1:11CV999
 )
THE STATE OF SOUTH CAROLINA, )
et al., )
 )
        Defendants. )

**MEMORANDUM OPINION, ORDER, AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This case comes before the Court on Plaintiff's Application for Leave to Proceed <u>In</u> <u>Forma</u> <u>Pauperis</u> (Docket Entry 1), filed in conjunction with Plaintiff's pro se Complaint (Docket Entry 2), as well as on Plaintiff's Motion for Annotation of New Critical and Timely Evidence (Docket Entry 4). For the reasons that follow, the Court will grant the latter Motion to submit new evidence; however, the Court will grant Plaintiff's Application to proceed as a pauper solely for the purpose of allowing consideration of a recommendation of dismissal.

LEGAL BACKGROUND

"The federal *in forma pauperis* statute, first enacted in 1892 [and now codified at 28 U.S.C. § 1915], is intended to guarantee that no citizen shall be denied access to the courts 'solely because his poverty makes it impossible for him to pay or secure

the costs.'" Nasim v. Warden, Md. House of Corr., 64 F.3d 951, 953 (4th Cir. 1995) (en banc) (quoting Adkins v. E.I. DuPont de Nemours & Co., 335 U.S. 331, 342 (1948)). "Dispensing with filing fees, however, [is] not without its problems. Parties proceeding under the statute d[o] not face the same financial constraints as ordinary litigants. In particular, litigants suing in forma pauperis d[o] not need to balance the prospects of successfully obtaining relief against the administrative costs of bringing suit." Nagy v. Federal Med. Ctr. Butner, 376 F.3d 252, 255 (4th Cir. 2004). To address this concern, the in forma pauperis statute provides that "the court shall dismiss the case at any time if the court determines that – . . . (B) the action . . . (i) is frivolous . . . ." 28 U.S.C. § 1915(e)(2).

The United States Supreme Court has explained that "a complaint, containing as it does both factual allegations and legal conclusions, is frivolous where it lacks an arguable basis either in law or in fact." Neitzke v. Williams, 490 U.S. 319, 325 (1989). "The word 'frivolous' is inherently elastic and not susceptible to categorical definition. . . . The term's capaciousness directs lower courts to conduct a flexible analysis, in light of the totality of the circumstances, of all factors bearing upon the frivolity of a claim." Nagy, 376 F.3d at 256-57 (some internal quotation marks omitted). The Supreme Court further has identified factually frivolous complaints as ones involving "allegations that

2

are fanciful, fantastic, and delusional. As those words suggest, a finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible, whether or not there are judicially noticeable facts available to contradict them." Denton v. Hernandez, 504 U.S. 25, 32-33 (1992) (internal citations and quotation marks omitted). In considering such matters, this Court may "apply common sense." Nasim, 64 F.3d at 954.

## DISCUSSION

Plaintiff's pro se Complaint asserts "violations of laws under US Code Title 18 and Title 42, as well as applicable state laws, common law laws, and any other's [sic] that the judge may deem applicable." (Docket Entry 2 at 2.) More specifically, it seeks "to form a class action lawsuit . . . appli[cable] to all the parent's [sic] that were illegally jailed for being indigent and could not therefore pay their child support." (Id.) According to the Complaint, "[t]he US Supreme Court has already ruled that [the proposed class members'] due process rights were violated four times each per the *Turner v. Rogers* (10-10) case published June 20, 2011." (Id.)[1] The Complaint further states that Plaintiff "had a

---

[1] In that case, the United States Supreme Court ruled that the Due Process Clause of the Fourteenth Amendment to the United States Constitution "does not automatically require the provision of counsel at civil contempt proceedings to an indigent individual who is subject to a child support order, even if that individual faces incarceration (for up to a year). In particular, that Clause does not require the provision of counsel where the opposing parent or other custodian (to whom support funds are owed) is not represented

3

lawsuit exactly the same as *Turner*, with the same question, the same cause, in the same state, with the same judges, over the same issues . . . [but it] was dismissed without prejudice by the district court in Charleston, South Carolina in 2010, *Bardes v. Magera* (2:08-CV-487-PMD-RSC)." (Id. at 3.) These allegations require dismissal of this case as frivolous for two reasons.

First, as a pro se litigant, Plaintiff cannot bring a class action. See, e.g., Lang v. Nordstrom, Inc., No. 00-1236, 229 F.3d 1143 (table), 2000 WL 1124534, at *1 (4th Cir. Aug. 9, 2000) (unpublished) ("[T]he district court properly dismissed [the plaintiff's] action to the extent that he sought to bring a class action because, as a pro se litigant, [he] was not an appropriate class representative.") (citing Oxendine v. Williams, 509 F.2d 1405, 1407 (4th Cir. 1975)). Second, Plaintiff's prior case cited in the Complaint (and identified therein as effectively identical to this case) did not end in a dismissal without prejudice; to the

---

by counsel and the State provides alternative procedural safeguards equivalent to . . . adequate notice of the importance of ability to pay, fair opportunity to present, and to dispute, relevant information, and court findings." Turner v. Rogers, ___ U.S. ___, ___, 131 S. Ct. 2507, 2520 (2011) (final parenthesis omitted). However, the Supreme Court further held that, because "[t]he record indicate[d] that [the petitioner in that case] received neither counsel nor the benefit of alternative procedures like those [the Supreme Court] described . . . [, but the state] court nonetheless found [him] in contempt and ordered him incarcerated . . . [, his] incarceration violated the Due Process Clause." Id. As a result, the Supreme Court "remand[ed] the case for further proceedings not inconsistent with [its] opinion." Id.

contrary, the United States District Court for the District of South Carolina:

1) dismissed without prejudice only the portion of that case in which Plaintiff sought to proceed on behalf of his children, Bardes v. Magera, No. 2:08-CV-487-PMD-RSC, 2009 WL 3163547, at *16 (D.S.C. Sept. 30, 2009) (unpublished), aff'd, 403 F. App'x 862 (4th Cir. 2010);

2) dismissed all of Plaintiff's claims except the individual capacity claim against Sheriff James Al Cannon, id.;[2] and

3) subsequently granted summary judgment to Sheriff Cannon on that remaining claim, Bardes v. Cannon, No. 2:08-CV-487-PMD, 2010 WL 3169614, at *5 (D.S.C. Aug. 9, 2010) (unpublished), aff'd, 403 F. App'x 862 (4th Cir. 2010).

Plaintiff thereafter brought another suit in that same court arising out of the same underlying facts and circumstances, which that court dismissed based on the doctrine of res judicata. Bardes v. South Carolina, C.A. No. 2:10-559-PMD, 2010 WL 1498190 (D.S.C. Apr. 12, 2010) (unpublished). For the same reasons and based on the same authority cited in that decision, the doctrine of res judicata or related principles of collateral estoppel similarly

---

[2] "Unless the dismissal order states otherwise, a dismissal under [Federal Rule of Civil Procedure 41(b)] and any dismissal not under [Federal Rule of Civil Procedure 41] – except one for lack of jurisdiction, improper venue, or failure to join a party under [Federal] Rule [of Civil Procedure] 19 – operates as an adjudication on the merits." Fed. R. Civ. P. 41(b).

5

foreclose Plaintiff from now re-litigating in this case (in this Court) matters that he raised (or could have raised) in the Magera case (in the District of South Carolina). The patency of these barriers to this action renders it legally frivolous.

To the extent the Complaint raises any individual claims not barred by res judicata/collateral estoppel, this case remains subject to dismissal based on factual frivolousness, i.e., it involves "allegations that are fanciful, fantastic, and delusional," Denton, 504 U.S. at 32-33 (internal citations and quotation marks omitted), and/or "the facts alleged rise to the level of the irrational or the wholly incredible," id. at 33. For example, the Complaint asserts as follows:

> This lawsuit can be summarized as a dead man that came back from the dead to seek retribution using the rule of law against his killers. I was murdered by a judge, a lawyer, and a sheriff in South Carolina. I was murdered in a specially designed hypothermic death chamber located in the booking area of the Charleston County Jail, Charleston, South Carolina on April 3rd, 2006. I committed no crime. I was falsely accused of being in child support arrears, but child support arrears and family court have nothing to do with this lawsuit, at no point do I take on those issues, the only applicability is that I was not in arrears, which the defendants concurred back in 2005, so everything they did to me was done so illegally. They also did not have jurisdiction over what they assumed was a child support order. At one point three state [sic] had me in false arrears, so that problem is self evident. I was put on trial six times and was found innocent in all, except the last one, and it was not a trial at all, I was just grabbed by the deputies six minutes after I entered the court room, was dragged to jail, and my killers did not even bother with a mug shot or fingerprints, I was just immediately locked into the death chamber with blasting 45 degree air
> . . . .

6

After nine hours of blasting 45 degree air my body temperature was forced down to 84 degrees [and] I was dead on the floor.  At 3:03am on the second day in the death chamber, nurse Cassandra Goodyear declared I was dead and two sheriff deputies concurred.  They decided to keep my dead body on the floor in the cold for two more days because I would have been the fourth murdered inmate in a week and they needed to stager the deaths to elude detection.  The medical knowledge of this lawsuit is fascinating as it gets to what is called freaky medicine, the areas where doctors have no explanation as to the continuation of life.  In Texas, a doctor has taken two dead heart attack patients deep into controlled hypothermia for hours and then rewarmed them carefully with tubes and machines, and the patients came back to life.  This technique of raising the dead will soon become standard practice all over the United States. It is all over Google.  Therefore, I can parade 100 or more doctors that can testify to just how dead I was.  Whatever my soul or sprit was, or is, it obviously was not in my dead body. . . .

At 2:55am on the third day in the death chamber, a miracle happened.  Wherever my soul or sprit was for 25 hours, it reoccupied my dead body and my heart started to beat and cold blood began to flow and my lungs filled with air and I was breathing again.  I had come back to life from the dead, I was literally resurrected from the dead.  The problem was that a human body that has been dead for 25 hours is not much good anymore, I only got half my brain back and I was partially paralyzed from the waist downward and my arms were paralyzed.  Whenever you read about someone in the hospital for hypothermia they only have a 50% of staying alive past a week.  The deaths from the warming up period outpace those from the cold.  But five years later, with only half a brain and half a body, I and a group of other diehards, have brought down what is now being unfolded and will become known as the largest mass killing of American citizens on American soil, at the hands of killer sworn civil servants, in the history of our nation.  The bad guys have already been caught, and it was the US Supreme Court that took out the beast with a single stroke of their golden pen from God.  I was only 1 of 40 moms and dads that were murdered in the past ten years.  This mess is akin to but eclipses the Chicago mob of the 1920's, from which the legal word 'racket' was born.  That racket consisted of "pay me money so we won't bomb your business," and it was the

7

cops throwing the bombs at night and the judges ran
immunity over murder.  It took Chicago ten years to
adjudicate the bad guys to prison and in my case the same
will apply.  But I am not asking the judge to put the bad
guys into criminal court as some may never be
adjudicated, so all I can do legally is file suit in
civil court and seek plain old redress consisting of
money damages equal to the amount stolen from me, to
bring the scales of justice back to the tare position.

. . . The week before I was murdered, I faxed all the
evidence and the date of my pending murder to two FBI
offices and even expressed [sic] mailed a CD-Rom to FBI
Director Robert Mueller, III, but I got murdered anyway,
right on the day I told them.  I even sent a hand written
letter from jail to the FBI office in Charleston begging
to be kept alive.  All that stuff, along with everything
I have unearthed since then, has been scanned into the
FBI's new case management database, so they are not much
help right now because their database fully implicates
them.  I don't understand what the FBI does, but they are
not much good in preventing us from being murdered by
their fellow civil servants.

. . . All of this mess started back in 2004 when my name
appeared in a state lawyer's database of non-custodial
dads.  The mastermind of the beast was a creepy state
lawyer for the social services department by the name of
John "Chuck" Megara.  Lawyer Magera had to carefully
calculate how many fathers and mothers to turn into
deadbeat dads and moms in a 80/20 ratio, and then funnel
them into courtrooms of the three family court judges,
that were the middle head of the three headed beast, so
the judges could throw four deadbeats in jail each day
times five days times three judges, minus the one's [sic]
that paid to get out, leaving only the indigent stuck in
jail for a year, to work the sheriff's slave labor gangs
twelve hours a day times seven days a week, of which half
of the money was underground and not reported.  The
sheriff in Charleston was making $9 million a year, but
all 48 state sheriffs were in on the scam too . . . .

They got me when the state instituted eighty different
destruction mechanisms to wipe me off the financial grid
forever, and in only nine months they liquidated my $10
million dollar business, and then wiped me off the
financial grid forever.  I was obliterated.  I carefully
documented the entire criminal racket and dutifully

8

cops throwing the bombs at night and the judges ran
immunity over murder.  It took Chicago ten years to
adjudicate the bad guys to prison and in my case the same
will apply.  But I am not asking the judge to put the bad
guys into criminal court as some may never be
adjudicated, so all I can do legally is file suit in
civil court and seek plain old redress consisting of
money damages equal to the amount stolen from me, to
bring the scales of justice back to the tare position.

. . . The week before I was murdered, I faxed all the
evidence and the date of my pending murder to two FBI
offices and even expressed [sic] mailed a CD-Rom to FBI
Director Robert Mueller, III, but I got murdered anyway,
right on the day I told them.  I even sent a hand written
letter from jail to the FBI office in Charleston begging
to be kept alive.  All that stuff, along with everything
I have unearthed since then, has been scanned into the
FBI's new case management database, so they are not much
help right now because their database fully implicates
them.  I don't understand what the FBI does, but they are
not much good in preventing us from being murdered by
their fellow civil servants.

. . . All of this mess started back in 2004 when my name
appeared in a state lawyer's database of non-custodial
dads.  The mastermind of the beast was a creepy state
lawyer for the social services department by the name of
John "Chuck" Megara.  Lawyer Magera had to carefully
calculate how many fathers and mothers to turn into
deadbeat dads and moms in a 80/20 ratio, and then funnel
them into courtrooms of the three family court judges,
that were the middle head of the three headed beast, so
the judges could throw four deadbeats in jail each day
times five days times three judges, minus the one's [sic]
that paid to get out, leaving only the indigent stuck in
jail for a year, to work the sheriff's slave labor gangs
twelve hours a day times seven days a week, of which half
of the money was underground and not reported.  The
sheriff in Charleston was making $9 million a year, but
all 48 state sheriffs were in on the scam too . . . .

They got me when the state instituted eighty different
destruction mechanisms to wipe me off the financial grid
forever, and in only nine months they liquidated my $10
million dollar business, and then wiped me off the
financial grid forever.  I was obliterated.  I carefully
documented the entire criminal racket and dutifully

8

reported it to Governor Mark Sanford and Senator's [sic] Graham and DeMint. I had previously met Governor Sanford in his office when a group of businessmen in Charleston wanted me to do for the state what I had done for public corporations as was the business of my company. When Governor Sanford read my evidence of the criminal network, he sent the stuff down to mastermind slimy attorney John Magera, who then did the hit on me himself. I had a state car parked out my front door, Magera changed his armed guards at his office door from sidearms to machine guns, and my picture was posted at the social services office doors. The 11 o'clock news in Columbia ran a news flash with my picture; my picture was printed on pizza boxes. I was South Carolina's most wanted master deadbeat dad on the run eluding capture, armed and dangerous, shoot at will when you see the person in the picture at the front door. I, of course, was doing nothing wrong, I had no guns, no bombs, no racine [sic] anywhere, I just stayed in my trailer. No one came to the door to ask even a single question, no 96 hour involuntary psychotic evaluations. I have no criminal record because I don't do crime. I am crime fighter. Attorney John Magera was so freaked out, he did not know how I was getting the contents of his trash can, and his Excel spreadsheets showing the entire math on how the racket worked, including the column for murder based on maximization of profits. All he knew is that somehow I had everything and he and his crooked cronies had to take me out, at any cost. My murder was an imperative, and I was extinguished right away. . . .

I came up with a plan that my dead body inside the sheriff's jail, would cause my family to bring in fleets of out-of-state lawyers and turn over every rock, and use my evidence to piece my murder together and expose the bad guys. The morning of my death, I saw no reason to do the dishes, so I dressed up in my Sunday best, drove to post office to mail my CO-Rom of evidence to my family and FBI Director Mueller, and then I drove two hours to my death. I did not bother putting a quarter into the meter as I was never going to see that vehicle again. I brushed off some lint on my blue blazer, and then walked right into the front doors of hell and nine hours later I was dead on the floor. They did not even bother to take a mug shot or fingerprints; they were in a hurry to murder me. The minute I walked into the jail, they stuffed me head first into the hypothermic murder chamber and locked the air tight door behind them and when I

9

looked up at the refrigeration vents up high on the walls
blowing the hair on head with super-chilled 45 degree
air, I thought darn, they are going to kill me with the
air-conditioner.  Satan had me trapped and God was
nowhere in sight.  I fought it the best I could, I ran in
place and did pushups and jumping jacks.  That made me
wet and cold.  All the while the guard's [sic] right
outside the door walked by and looked in and watched me
trying to stay alive.  The extent that the human body
will go to try to stay alive is amazing.  At points of
desperation I pounded on the door until my hands were
raw, and I scratched my fingernails bloody into walls of
concrete in the attempts to find a way out of cell to
stay alive.  I was a rat in a cage that withheld life
support. After being forced to accept full defeat of
trying to stay alive, I had to sit down on the slab and
then just suffer through all the multiple levels of the
second most painful death next to death by fire.  I was
locked into a death chamber with Satan himself and I put
up a valiant fight but was over matched and Satan won.
At around the ninth hour, the guard standing at the
window in the chamber door, saw my body fall to the floor
in a position that indicate [sic] that I was not alive,
and he called for the nurse, Cassandra Goodyear.  After
seeing that I was dead, Nurse Goodyear logged into the
jails transaction log database and made an entry at
3:02am on the second day that I was inside the chamber
and was to remain there undisturbed for two more days.

(Docket Entry 2 at 9-15.)[3]

The Complaint goes on to allege, inter alia, that:

1) "hypothermic murder chambers are in full use all over the country by the states and federal government alike" (id. at 18);

---

[3] Plaintiff presented similar allegations of torture in a "cold cell" in the Charleston County Detention Center in his prior litigation in the District of South Carolina, but asserted only that he had fallen into a coma and "believed he died." Magera, 2009 WL 3163547, at *4.  In granting summary judgment to Sheriff Cannon in that case, the court stated that "Plaintiff ha[d] failed to offer any credible proof that he was housed in a cell that was maintained at an extremely low temperature, let alone proof that Sheriff Cannon approved the use of a 'cold cell' to torture certain inmates." Cannon, 2010 WL 3169614, at *4.

10

2) some time in or around 2004, the State of South Carolina financed a $100,000,000,000 land purchase "us[ing] old confederate money" (that they still had on hand because "Charleston was the confederate bank") and that land can serve as compensation for the "30,000 moms and dads and their kids" who the State of South Carolina victimized (id. at 33-34);

3) Plaintiff's death and resurrection closely mirrored that of Jesus Christ, in that they both were murdered on April 3 by hypothermia caused by the blowing of cold air for nine hours (wind in the case of Jesus and air conditioning in the case of Plaintiff) and both were resurrected three days later (id. at 37);

4) testing done on Plaintiff after he enrolled at the University of Denver revealed that, "for a brief time, [he] had the best brain of all 19 year olds alive at the time" (id. at 43);

5) after working in the insurance industry, Plaintiff "became one of [then-New York Attorney General Elliot] Spitzer's most prized inside informants," until the insurance industry "had to resort to making Spitzer the Governor of New York as the only way to make him go away" (id. at 46); and

6) sometime in or around 2002, Plaintiff got a telephone call from United States Senator Chuck Grassley (R-Iowa), who "wanted to know how to get rid of some insurance lobbyists that . . . appeared in the pew behind him at Church," whereupon Plaintiff told Senator Grassley "to tell them to go away and if they don't they are

11

committing a crime" and, although Plaintiff "ha[s] no idea how it turned out, . . . [he] can say that Senator Grassley is on the no touch list of the insurance lobby and no one will ever sit behind him in church again" (id. at 48-49).[4]

After carefully considering these matters and employing common sense, the undersigned Magistrate Judge concludes that Plaintiff's Complaint reflects the delusional, wholly incredible allegations of someone suffering from mental illness. Indeed, the Complaint acknowledges that Plaintiff has a long history of depression, even pre-dating his alleged torture in South Carolina. (Docket Entry 2 at 38.) "Insubstantial and frivolous conspiracy theory claims like Plaintiff's are routinely dismissed as frivolous . . . ." Seymour v. United States Dep't of Defense, No. 10CV983JLS(JMA), 2011 WL 761547, at *4 n.5 (S.D. Cal. Feb. 24, 2011) (unpublished) (internal

---

[4] In addition, Plaintiff's Motion for Annotation of New Critical and Timely Evidence (which the Court grants) seeks to add allegations that x-rays taken of his hips after an auto accident revealed the presence of a bullet and that "[t]he only time someone could have discharged a bullet into [his] body without [him] knowing about it . . . [was] [d]uring th[e] time [his] body was temporarily dead from the hypothermia." (Docket Entry 4 at 1-2.)

12

brackets and quotation marks omitted) (citing cases).[5] This Court should do the same.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Annotation of New Critical and Timely Evidence (Docket Entry 4) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's Application for Leave to Proceed In Forma Pauperis (Docket Entry 1) is **GRANTED FOR THE LIMITED PURPOSE OF ALLOWING THE COURT TO CONSIDER A RECOMMENDATION OF DISMISSAL.**

**IT IS RECOMMENDED** that this action be dismissed under 28 U.S.C. § 1915(e)(2)(B)(i) as frivolous.

                                           /s/ L. Patrick Auld
                                                 **L. Patrick Auld**
                                    **United States Magistrate Judge**

July 24, 2013

---

[5] Given the Complaint's acknowledgment that "[t]he events in question happened in 2006" (Docket Entry 2 at 64), applicable statutes of limitations likely would defeat Plaintiff's claims as a matter of law, as well. See Nasim, 64 F.3d at 955. Moreover, the Court could dismiss the bulk of the defendants, including the States of North Carolina, Pennsylvania, and South Carolina, as well as the United States and its agencies, branches, and/or departments (see Docket Entry 2 at 4), based on their immunity from damages actions of this sort. See 28 U.S.C. § 1915(e)(2)(B)(iii). However, in light of the frivolity of the Complaint, no reason exists to address such matters more fully.

13